UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TIMOTHY CHAPPELLE**,<br><br>Plaintiff,<br><br>v.<br><br>**XAVIER BECERRA**, in his official capacity<br>as Secretary, United States Department of<br>Health and Human Services<br><br>Defendant. | Case No. 22-cv-87 (CRC) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Timothy Chappelle, who is African-American, has served for over two decades as a senior grants management specialist at the Administration of Children and Families ("ACF" or the "Agency") within the Department of Health and Human Services ("HHS"). In 2018, he was not selected for one of six supervisory grants management positions within ACF. That same year, the Agency neglected to compensate him for the first five months of his temporary detail as an acting division director. Then, in 2020, he was not selected for another supervisory grants management position.

In this suit against HHS, Chappelle claims he was not selected for the 2018 position because of his race, sex, age, and disability. He says he was not selected for the 2020 position and not appropriately compensated while on detail for the same reasons, and because he filed an EEO complaint concerning the 2018 non-selection. HHS moves for summary judgment.

For the reasons explained below, the Court will deny summary judgment on Chappelle's claims of race and sex discrimination arising out of the 2018 non-selection and grant summary judgment to HHS on all other claims.

I.    **Background**

    A.  Factual Background

Timothy Chappelle is a GS-14 grants management officer at ACF.  Def.'s Ex. 51

("Chappelle Depo"), ECF No. 20-10, at 4:20–24.   He has worked at ACF since its inception in

1990 and has served as supervisory grants management specialist since June 2004.  Pl.'s Ex. 5

("Chappelle Work Experience"), ECF No. 24-5, at 1, 6.  He performs supervisory,

administrative, and oversight functions to support the awarding of grants to the Agency for

Native Americans, Office of Community Services, and Office of Refugee Resettlement.  Id. at 1.

    Chappelle has had Graves Disease since 2003.  Pl.'s Stmt. of Genuine Issues, ECF No.

27-1, ¶ 3.  Graves Disease is an autoimmune condition that causes Chappelle's eyes to protrude

and creates dry eye, a condition that is exacerbated by prolonged computer use.  Pl.'s Ex. 1

("Chappelle Decl."), ECF No. 24-1, ¶ 6.  He also experiences symptoms including nervousness

and sweating heavily under the arms.  Id.  Due to this condition, Chappelle has received a

documented Reasonable Accommodation and uses a special glass monitor cover to block the

glare from computer screens.  Def.'s Ex. 1 ("2019 Chappelle Affidavit"), ECF No. 20-5, at 3.

    Chappelle's first-level supervisor for several years, through her retirement in December

2018, was Daphne Weeden, the Director of the Division of Discretionary Grants.  Def.'s Ex. 5

("Weeden Affidavit"), ECF No. 20-5, at 2.  Weeden's supervisor, in turn, was Ben Goldhaber,

the Deputy Assistant Secretary of Administration in ACF.  Id.

    Throughout his tenure at ACF, Chappelle consistently achieved excellent performance

ratings.  Pl.'s Ex. 2 ("Weeden Depo"), ECF No. 24-2, at 7:7–8.  In 2018, however, he initially

received a 4.4 rating, which corresponds to "Achieves More Than Expected Results," the second

highest rating after "Outstanding."  Pl.'s Ex. 8 ("PMAP Rating"), ECF No. 24-8, at 1.  After

Chappelle challenged this rating, the Agency acknowledged that it had made a "miscalculation" and adjusted his rating to a 4.6, which corresponds to "Outstanding."  Chappelle Decl. ¶ 5.

Chappelle brings claims in this case relating to: (1) nonpayment for his temporary promotion in 2018–2019; (2) non-selection for a promotion in 2018; and (3) non-selection for a promotion in 2020.

### 1.  Temporary Promotion

In 2018, Chappelle's supervisor, Daphne Weeden, was detailed to the position of Acting Director of the Office of Grants Management.  2019 Chappelle Affidavit at 9–10.  She recommended Chappelle for a detail covering her position as Acting Director of the Division of Discretionary Grants, a GS-15 position.  Weeden selected Chappelle because she "felt he was the most experienced of the Grants Officers that were on staff" and "routinely acted in [her] absence."  Weeden Depo at 7:14–18, 13:15–17.

Chappelle's detail lasted eleven months, from March 2018 to February 2019.  2019 Chappelle Affidavit at 9.  Because he was detailed to a GS-15 position, Chappelle should have been paid at a higher level during his temporary promotion.  Id. at 10.  In August 2018, however, five months into the detail, Chappelle discovered that he was not being paid at the appropriate level.  Id.  He brought the error to Weeden's attention, who promptly initiated the paperwork to compensate Chappelle at the higher level.  Id.; see Def.'s Ex. 6 ("Emails Between Chappelle and Weeden"), ECF No. 20-5; Def.'s Ex. 7 ("Emails Between Weeden and Ingram"), ECF No. 20-5. Chappelle's temporary promotion took effect on October 28, 2018.  Def.'s Ex. 9 ("SF-50"), ECF No. 20-5.  At that time, his salary increased from $141,328 annually to $152,760.  Id.  But he was not compensated for the difference in pay from March 2018 to August 2018.  Compensation for a temporary detail is capped at 120 days according to the Agency, though Chappelle asserts

that the period of increased compensation can be renewed for longer.  Def.'s Ex. 2 ("Goldhaber Affidavit"), ECF No. 20-5, at 9; Opp'n at 17.

> ## 2.  *2018 Supervisory Grants Management Specialist Position*

In August 2018, while Chappelle was serving as the Acting Director of Discretionary Grants, the Agency advertised six vacant GS-15 Supervisory Grants Management Specialist positions.  Chappelle Decl. ¶ 4; Def.'s Ex. 10 ("2018 Posting"), ECF No. 20-5, at 1–2.  Announcing the posting of these six positions to ACF senior leadership, Goldhaber explained that ACF was transitioning to a new business model.  Def.'s Ex. 11 ("Email from Goldhaber to Senior Leadership"), ECF No. 20-6.  Under the new model, the ACF grants portfolio would be separated into "six different programmatic grants," each "led by a senior manager" who would "ensure that programs are managed consistently across the nation and across ACF."  Id.  The responsibilities of the new position included "[p]roviding technical expertise, direction and oversight" for ACF grants, "[p]roviding executive direction, leadership guidance" and advice to the Director, "[a]ssuring uniform interpretation and application of Federal laws [and] regulations," "direct[ing] overall planning and budgeting," and performing day-to-day supervision of staff.  2018 Posting at 2.

Chappelle applied for one of the six positions in early September 2018.  2019 Chappelle Affidavit at 5.  The selecting officials were Weeden, Goldhaber, and Lila Lee, the Chief of Staff in the Agency's Office of Administration.  Weeden Depo at 31:3–6; Pl.'s Stmt. of Genuine Issues ¶ 26.  After two rounds of interviews, Weeden, Goldhaber, and Lee, who were also the panelists for the second round, selected six applicants.  Pl.'s Stmt. of Genuine Issues ¶ 26.  Although Weeden "submitted Tim Chappelle as one of [her] selectees," Weeden Depo at 31:18–19, he was not ultimately offered the position because Lee and Goldhaber did not agree to his

4

selection.[1]  Id. at 31:12–19.  Instead, the Agency initially offered the positions to Alicia

Dammar, Jennifer Richards, Julie Hopkins, Clinton McGrane, Jeffrey Newton, and Charisse

Johnson.  Def.'s Ex. 12 ("Def.'s Responses to Interrogatories"), ECF No. 20-6, at 6–8.  When

Jeffrey Newton declined the position, Janice Davis Caldwell was selected instead.  Pl.'s Stmt. of

Genuine Issues ¶¶ 30–31.

Most of the successful candidates had extensive grants management experience.

Dammar, Davis Caldwell, and Newton were Grants Management Officers with more than fifteen

years of experience in the area.  Def.'s Exhibit 23 ("Dammar Job Application"), ECF No. 20-7;

Def.'s Ex. 25 ("Davis Caldwell Job Application"), ECF No. 20-7; Def.'s Ex. 33 ("Newton Job

Application"), ECF No. 20-8.  Richards served in a GS-15 role as the Director of the Division of

Mandatory Grants when she applied.  Def.'s Ex. 35 ("Richards Job Application"), ECF No. 20-8.

And McGrane was a Grants Officer for ACF's New York and San Francisco Regional Offices.

Def.'s Ex. 31 ("McGrane Job Application), ECF No. 20-8.

Two of the selectees, however, had no grants management experience.  Charisse Johnson

had served as a GS-14 supervisory family-assistance-program specialist/branch chief since

March 2012 when she applied.  Def.'s Ex. 29 ("Johnson Job Application"), ECF No. 20-7.  Prior

to that, she worked as a program specialist in the North Carolina Department of Health and

Human Services.  Id.  Julie Hopkins was a program manager in ACF with over twenty years of

experience in federal, state, and local child-support programs.  Def.'s Ex. 27 ("Hopkins Job

Application"), ECF No. 20-7.

---

[1] As the Court will discuss in further detail infra, Goldhaber disputes this characterization
and asserts that Weeden in fact made the final decision not to select Chappelle.

As relevant to Chappelle's discrimination claims, the demographic information of the seven selectees was as follows: five women (Dammar, Davis Caldwell, Hopkins, Johnson, and Richards) and two men (Newton, McGrane), and one American Indian (Dammar), one Hispanic (Richards), two African-American (Davis Caldwell and Johnson), and three white (Newton, McGrane, and Hopkins) employees. Davis Caldwell, Hopkins, Johnson, McGrane, Newton, and Richards ranged in age from 53–63 years old. Dammar was 45. Pl.'s Stmt. of Genuine Issues ¶ 27. The record does not indicate that any of the selectees suffers from Graves Disease or another disability.

### 3. 2020 Position

After Chappelle was passed over for the 2018 position, he continued in his detailed Acting Director role until February 2019. 2019 Chappelle Affidavit at 9. Then, in the summer of 2020, Charisse Johnson left the Agency. Def.'s Ex. 39 ("Webb Affidavit"), ECF No. 20-8, at 11–12; Def.'s Ex. 3 ("2021 Chappelle Affidavit"), ECF No. 20-5, at 2. Sandra Webb, the Associate Deputy Assistant Secretary for Grants, selected Chappelle to cover Johnson's position—GS-15 Portfolio Director for Community Strengthening—in an acting capacity from June 2020 to November 2020. 2021 Chappelle Affidavit at 6; Webb Affidavit at 11. Chappelle's temporary GS-15 promotion expired in November 2020, but he continued to perform the responsibilities of the position for another four months, until March 2021. Webb Affidavit at 11. Webb chose Chappelle to fill in for Johnson because "as one of two GMOs," he was "the most experienced GMO" responsible for the community-strengthening portfolio. Id. at 12.

In August 2020, the Agency advertised to permanently fill the Portfolio Director position. Pl.'s Stmt. of Genuine Issues ¶ 37; see Def.'s Ex. 38 ("2020 Posting"), ECF No. 20-8. Once

again, Chappelle applied.  Pl.'s Stmt. of Genuine Issues ¶ 39; Chappelle Decl. ¶ 7.  This time, Sandra Webb was the selecting official.  Pl.'s Stmt. of Genuine Issues ¶ 38.  Once again, two rounds of interviews were conducted.  Webb Affidavit at 4.  After the first round, the top three candidates were Marco Santos, Stefanie Gordon, and Chappelle, in that order.  Pl.'s Stmt. of Genuine Issues ¶ 45.

Webb then interviewed the top three candidates herself.  Id. ¶ 46; Webb Affidavit at 4. After the interview, she selected Marco Santos, a male employee in his late thirties, for the position.  Pl.'s Stmt. of Genuine Issues ¶ 48; Webb Affidavit at 8, 13. [2]  Santos developed his grants management experience at the Environmental Protection Agency and then at the Department of Housing and Urban Development ("HUD").  Def.'s Ex. 50 ("Santos Selection Memorandum"), ECF No. 20-10.  He was a GS-14 lead grants management specialist at HUD when he applied for the Portfolio Director position.  Id.  Webb selected Santos because he "ranked first" in both interviews and "demonstrated superior knowledge and abilities in the technical aspects of grants management."  Santos Selection Memorandum.  She also noted that Santos's references called him a "federal grant policy expert" with a "brilliant mind" and "kind, thoughtful, diplomatic approach."  Webb Affidavit at 8.  Webb acknowledged, however, that unlike Chappelle, Santos did not have executive-level experience.  Def.'s Ex. 55 ("Webb Depo"), ECF No. 20-10, at 28:18–21.

B.  Procedural History

Chappelle contacted an internal EEO counselor within ACF on November 2, 2018, to challenge his non-selection for the 2018 position and the underpayment during the first five

---

[2] Chappelle asserts at one point that Santos is white, Chappelle Decl. ¶ 7, and at another that he is Filipino, 2021 Chappelle Affidavit at 6.  The Agency nowhere appears to identify Santos's race or national origin.

months of his 2018–2019 detail.  2019 Chappelle Affidavit at 1; see Def.'s Ex. 53 ("Notice of

Right to File"), ECF No. 20-10.  He received notice of the right to file a complaint from the

EEOC in January 2019.  Notice of Right to File.  Chappelle contacted an EEO counselor again in

March 2021 to challenge his non-selection for the 2020 position and received notice of the right

to file a complaint in April 2021.  Def.'s Ex. 54 ("EEOC Pre-Complaint Report"), ECF No. 20-

10.

Chappelle filed this suit against HHS Secretary Xavier Becerra in his official capacity on

January 13, 2022.  He brings three discrimination claims.  Count I alleges that the Agency

discriminated against him on the basis of race, sex, age, and disability, in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C.§ 2000e-1 et seq., the Age Discrimination in Employment

Act of 1967, 29 U.S.C. § 633a, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., by

not selecting him for the 2018 position.  Compl. ¶¶ 24–25.  Count II alleges that the Agency

discriminated against Chappelle on the basis of race, sex, age, disability, and prior protected

EEO activity by not selecting him for the 2020 position.  Compl. ¶¶ 26–27.  Count III alleges

that the Agency discriminated against Chappelle on the basis of race, sex, age, disability, and

prior protected EEO activity by refusing to pay him the additional compensation he was due for

his 2018–2019 temporary promotion.  Compl. ¶¶ 28–29.  For the reasons that follow, the Court

will deny summary judgment on Count I but grant summary judgment to HHS on Counts II and

III.

## II.   Legal Standards

To prevail on a motion for summary judgment, the moving party bears the burden of

demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the outcome of the litigation.  Holcomb, 433 F.3d at 895; Liberty Lobby, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.

In considering a motion for summary judgment, the Court must resolve all factual disputes and draw "all justifiable inferences" in favor of the non-moving party.  Liberty Lobby, 477 U.S. at 255; see also Mastro v. Pepco, 447 F.3d 843, 850 (D.C. Cir. 2006).  But the non-moving party's opposition must consist of more than mere allegations or denials; instead, it must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  "[T]he moving party is entitled to judgment as a matter of law if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'"  Eddington v. United States Dep't of Def., 35 F.4th 833, 836–37 (D.C. Cir. 2022).  When "determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  Local Civ. R. 7(h).

To make an actionable claim of discrimination under Title VII, the Age Discrimination in Employment Act, or the Rehabilitation Act, Chappelle must allege that he has suffered an adverse employment action because of his race, color, religion, sex, or national origin.  See 42 U.S.C. § 2000e et seq.; Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008); Koch v. Schapiro, 697 F. Supp. 2d 65, 69 (D.D.C. 2010) (noting the essential elements common

across discrimination and retaliation claims under Title VII, the ADEA, and the Rehabilitation Act). "To make out a Title VII discrimination claim, a [plaintiff] must show some harm respecting an identifiable term or condition of employment," but need not show a significant harm. Muldrow v. City of St. Louis, 601 U.S. 346, 354–56 (2024).

Here, the Agency has offered evidence, pursuant to the McDonnell Douglas burden-shifting framework, of legitimate, non-discriminatory reasons for selecting other candidates over Chappelle. Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973)). Consequently, to overcome HHS's summary judgment motion, Chappelle must offer sufficient evidence for a reasonable jury to infer that the Agency's asserted reasons were not the actual reasons for his non-selection (and nonpayment). See Brady, 520 F.3d at 494. In considering that question, the Court asks "whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016) (citing Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).

In a case of alleged discrimination, the Court must apply the standards for summary judgment strictly because "discriminatory intent and proof of disparate treatment are notoriously difficult to establish." Ross v. Runyon, 859 F. Supp. 15, 21–22 (D.D.C. 1994), aff'd per curiam, No. 95–5080, 1995 WL 791567 (D.C. Cir. Dec. 7, 1995). Thus, summary judgment in such cases must be approached with caution. McCain v. CCA of Tennessee, Inc., 254 F. Supp. 2d 115, 119 (D.D.C. 2003).

### III. Analysis

A. <u>Count I</u>

Chappelle first challenges his non-selection for the 2018 position.  Because a reasonable jury could conclude that Chappelle was significantly more qualified than two of the selectees and could infer pretext from other evidence in the record, the Court will deny summary judgment on Chappelle's race and sex discrimination claims.  See <u>Hamilton v. Geithner</u>, 666 F.3d 1344, 1352 (D.C. Cir. 2012).

*1. Relative Qualifications*

"If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture."  <u>Aka</u>, 156 F.3d at 1294.  In this case, seven applicants were selected over Chappelle: Dammar, McGrane, Newton, Richards, Davis Caldwell, Hopkins, and Johnson.  Chappelle need only offer sufficient evidence from which a jury could find him significantly better qualified than *one* of the seven to survive summary judgment.  Chappelle has done better than that.  He has produced evidence from which a jury could conclude that he is significantly better qualified than two of the selectees—Charisse Johnson and Julie Hopkins.

For starters, neither Hopkins nor Johnson had any experience in grants management.  Hopkins was a program manager in ACF when she applied for the position.  See Hopkins Job Application.  According to Weeden, Hopkins "did not have direct Grant experience" or "direct experience in the functional areas of the Office of Grants Management."  Weeden Depo at 32:1–2; Weeden Affidavit at 5.  Goldhaber, too, confirmed that Hopkins "was not a grants manager by

training" and "had not been employed as a grants management specialist in the past."  Pl.'s Ex. 10 ("Goldhaber Depo"), ECF No. 25-10, at 18:3–4, 19:3–4.

Both selection officials said the same about Johnson.  She served as a supervisory programs specialist when she applied and did not have "a direct Grants Management experience."  Weeden Depo at 32:19–22; Johnson Job Application.  Thus, she "did not perform as a grants specialist" prior to being selected.  Goldhaber Depo at 19:10–13.

Chappelle, on the other hand, began serving as a supervisory grants management specialist in June 2004, so he had over fourteen years of grants management experience when he applied in 2018.  2021 Chappelle Affidavit at 1.  And at the time he applied, he had already served for several months as the Acting Director of the Division of Discretionary Grants, a GS-15 position.  2019 Chappelle Affidavit at 9.  Recall that all three candidates were applying to be a Supervisory *Grants Management* Specialist.  2018 Posting (emphasis added).  The first responsibility listed on the job posting was to "[p]rovid[e] technical expertise, direction and oversight" for ACF grants.  Id.  A jury could conclude that Chappelle, someone with deep grants management experience at an executive level, was "significantly better qualified" for a grants management specialist position than two people with no grants experience at all.  See Aka, 156 F.3d at 1294.[3]

But you need not take the Court's word for it.  Take Weeden's, instead.  She testified that Chappelle "was a better fit, based on his Management and Grants experience, and the length of time that he had been in the Office of Grants Management" than either Johnson or Hopkins.

---

[3] The Court notes, however, that a plaintiff need not demonstrate that a jury could find him *significantly* more qualified than the selectees to survive summary judgment when, as here, the record contains evidence of "other flaws in the employer's explanation."  Hamilton, 666 F.3d at 1352.

Weeden Depo at 35:8–12.  In Weeden's view, Chappelle would have been a "better selection than someone who did not come with a [g]rants background, even though they may have had a strong Management background, or an Academic background" because he "had the direct experience to do the job."  Id. at 34:1–5.

To be sure, the Agency provides some explanation for selecting Johnson and Hopkins over Chappelle.  But its reasons are unsatisfying.  They largely boil down to two.  First, Johnson and Hopkins had management experience.  Second, Chappelle's interview performance did not suggest sufficient capability to handle the Agency's impending organizational change.

As to the candidates' management experience, Weeden acknowledged that despite lacking grants experience, Hopkins had "management skills" and Johnson had "some Management background."  Id. at 32:2–3, 20–21.  Goldhaber testified that Hopkins was selected over Chappelle because she had "experiences and qualities in leadership, project management, technology," which were "very helpful and essential for the purposes of the positions being hired, which were *managers* of grants management, not grants practitioners."  Goldhaber Depo at 20:9–15 (emphasis added).  As for Johnson, Goldhaber explained the choice by saying that she had "a range of [desirable] experiences, skills, knowledges," a "rich history in the field" and that she "had been with the Agency in management positions."  Id. at 31:15–16.

A reasonable jury could disbelieve this reason for choosing Johnson and Hopkins over Chappelle because it could conclude Chappelle had more management experience than either of them.  Chappelle had been in a supervisory role since 2004, and at the time he applied, he was a GS-15 acting director of a division.  Neither Hopkins nor Johnson, on the other hand, had served in a director position—Hopkins had been a program manager and Johnson had been a branch chief.  As Goldhaber admitted, "division directors typically are thought of as higher than branch

chiefs."  Id. at 26:16–18.  Besides, Weeden told Goldhaber that Chappelle had demonstrated

"management skills," including while working directly with him.  Weeden Depo at 33:9–11,

34:8–9.  And Goldhaber acknowledged that neither Hopkins nor Johnson had "served on a detail

as a manager several times" as Chappelle had.  Goldhaber Depo at 19:14–15.  So, a jury could

conclude either that Chappelle had *more* management experience than Hopkins or Johnson, or at

the very least, just as much—such that management skills did not justify their selection.

Second, the Agency argues that in his interview, Chappelle "did not express sufficiently

the qualities of leadership" or "approaches he would take to enable the culture change" within

ACF.  Def.'s Mot. for Summ. J. at 27–28.  As an initial matter, the Agency appears to rely

almost exclusively on its response to Chappelle's interrogatories for this justification.  See Def.'s

Ex. 4 ("Chappelle Answers to Interrogatories"), ECF No. 20-5.  And because that response is

signed only by the Agency's legal representative, not by anyone who can attest to their truth, it is

likely inadmissible.  See Alexander v. F.B.I., 192 F.R.D. 50, 52 (D.D.C. 2000); Fed. R. Civ. P.

33(b)(2).

But even if the Agency were to cure this defect, a jury could conclude that this asserted

justification does not hold water, either.  First, the lackluster description of Chappelle's interview

performance conflicts with Weeden's testimony that Chappelle "did very well" in his interview

and that the other interviewers, Goldhaber and Lee, did not "have any criticism of Mr.

Chappelle's performance during the interview."  Weeden Depo at 29:16–17, 29:21–30; see

Weeden Affidavit at 5 (noting that Chappelle "was poised and thorough in responding to

questions" and that his answers "were not inferior" to those of the selectees).  Second, the fact

that Weeden judged Chappelle's interview performance differently from the other interviewers

reveals the subjectivity inherent in that assessment.  And "in cases where a jury could reasonably

find that the plaintiff was otherwise significantly better qualified than the successful applicant,"

which as just explained, a jury could do here, "an employer's asserted strong reliance on

subjective feelings about the candidates may mask discrimination." Aka, 156 F.3d at 1298.  As

the D.C. Circuit recently recognized, "assessments of interview performances and dubious

scoring systems can be used to cover up discriminatory hiring practices" because "[t]he measure

of interview performance is hardly an exact science."  Stoe v. Barr, 960 F.3d 627, 644 (D.C. Cir.

2020).

Drilling down on the specific answers highlighted by the Agency reveals further

inconsistencies.  The Agency supports its characterization of Chappelle as ill-equipped to meet

the needs of an organization in flux because when asked about one of his hardest professional

challenges, he "cited formation of a workgroup to create a grants manual, rather than an example

that created cultural or other change."  Def.'s Responses to Interrogatories at 11.  But by its own

admission, the Agency asked Chappelle to describe a professional challenge, not an instance of

innovation.  It cannot penalize him for failing to answer an unasked question.  Plus, Goldhaber's

interview notes tell a different story.  He wrote that along with the grants manual example,

Chappelle discussed an instance in which he "needed to implement *system changes* which was

new challenge."  Def.'s Ex. 37 ("Chappelle Interview Notes"), ECF No. 20-8, at 1 (emphasis

added).  And Goldhaber's interview notes for Johnson, one of the selectees, hint at a double

standard.  When asked how she would handle a staff member who cannot adapt to change—an

interview question that *actually* directed the respondent to talk about organizational change—

Johnson "*didn't discuss change*."  Def.'s Ex. 30 ("Johnson Interview Notes"), ECF No. 20-7, at 1 (emphasis added).[4]

Finally, a contemporaneous window into the Agency's reasoning comes from Goldhaber's response when Weeden advocated for Chappelle.  Goldhaber acknowledged that Chappelle "had the experience and background" to do the job, but he "just did not feel that Mr. Chappelle" could "get[] to the next level."  Weeden Depo at 34:11–17.[5]  This statement does not accord with the agency's post-hoc reasons detailed above, is unspecific, and relies entirely on Goldhaber's subjective feelings.  See Aka, 156 F.3d at 1298; Yazzie v. Nat'l Org. for Women, No. CV 19-3845 (RDM), 2024 WL 230244, at *10 (D.D.C. Jan. 22, 2024) (noting that an employer must provide a "clear and reasonably specific explanation" for its actions).  Nothing in the Agency's explanation for its choice prevents a jury from concluding, based on the evidence already discussed, that Chappelle was significantly more qualified than Johnson or Hopkins, so summary judgment is inappropriate here.  See Aka, 156 F.3d at 1294.

### 2.  Other Evidence of Discrimination

An employer's "inconsistent or dishonest explanations" also may provide support for an inference of discrimination.  Wheeler, 812 F.3d at 1115.  Beyond Chappelle's qualifications, a

---

[4] The Agency also asserts that Chappelle was not selected because he "presented as tactically oriented rather than strategic-minded" and one of his interview answers suggested "*a static* mindset bound by legacy grants operations."  Def.'s Response to Interrogatories at 7.  The Court discerns little difference between being "tactical" and being "strategic" and doubts that the answer identified by the Agency in fact suggests a "static mindset."  See Def.'s Mot. for Summ. J. at 28.  In any event, a jury could infer that these subjective reasons, too, are pretextual, especially if it concludes that Chappelle was significantly more qualified than Johnson or Hopkins.

[5] Goldhaber's own deposition does not reveal further specifics about why Chappelle was not selected, other than the reasons already noted for selecting Johnson and Hopkins.  See Goldhaber Depo.

jury could also draw an inference of discrimination from evidence suggesting that Goldhaber may have prevaricated about whether he made the decision not to select Chappelle.

Weeden testified that after she discussed the candidates with the other members of the interview panel, and "submitted Tim Chappelle" as one of her selections, "Goldhaber made the final decision" not to pick him.  Weeden Depo at 31:5–6, 18–19.  Goldhaber, on the other hand, testified that he "was not" the selecting official, and that *Weeden* decided not to choose Chappelle.  Goldhaber Depo 12:7–9, 21.[6]  So either Goldhaber or Weeden sought to evade responsibility for the ultimate decision.  If a jury chooses to credit Weeden's testimony, as it is free to do, Goldhaber's obfuscation could suggest consciousness of guilt and call into question his overall credibility.  Indeed, "[a] factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'"  Stoe, 960 F.3d at 646 (citation omitted); see id. (noting that a reasonable jury could view "shifting explanations of the selection decision as evidence of pretext to cover up [] bias").

Chappelle offers additional, though weaker, evidence from which a jury could infer discrimination.  He has raised a dispute of material fact as to whether Goldhaber unfairly lowered his 2018 performance rating.  Compare Goldhaber Depo at 48:16–17 (admitting that Goldhaber lowered Chappelle's 2018 rating because '[Weeden's] writeup didn't support a rating of 5.0 on the administrative element,'" with Chappelle Decl. ¶ 5 (Chappelle's lower 2018 rating was adjusted upward because of a "miscalculation").  Chappelle also asserts, albeit without any statistical analysis, that Goldhaber has a pattern of discriminating against African-American male

---

[6] Though he characterizes the decision as a "consensus choice," Goldhaber emphasized that Weeden "ultimately was the selection official."  Goldhaber Depo at 14:3–4.

employees, 2019 Chappelle Affidavit at 7, and Goldhaber confirmed that he made the decision to reassign two such employees. Goldhaber Depo at 41:5–17.

This and the qualifications evidence place this case practically on all fours with Stoe v. Barr. There, the plaintiff alleged that the Department of Justice denied her a promotion because of her age and gender after an interview process. 960 F.3d at 629. The Department retorted that the male selectee's "answers better demonstrated his relevant experience and narrowly superior qualifications across the board than did [plaintiff's]." Id. at 640. The Circuit reversed the grant of summary judgment to the Department because the record supported the plaintiff's claim that she was better qualified than the selectee and she had offered other evidence of discrimination, including irregularities in the selection process, the hiring official's "decision to base the selection entirely on the interviews," and the Department's "shifting and false rationales for [] inconsistent actions." Id. at 643–44; see Hamilton, 666 F.3d at 1352 (holding that the evidence of plaintiff's superior qualifications taken together with "other flaws in the employer's explanation" created a genuine issue of material fact for a jury). Chappelle has done the same here.

### 3. Specific Bases of Discrimination

The Court thus concludes that a reasonable jury could disbelieve the Agency's reasons for not selecting Chappelle. "Because in appropriate cases a 'factfinder's disbelief of the reasons put forward by the defendant' may support an inference of intentional discrimination," courts "do not routinely require plaintiffs 'to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.'" Stoe, 960 F.3d at 640 (citing Aka, 156 F.3d at 1290). However, "in some instances . . . the fact that there are material questions as to whether the employer has given the real explanation will not suffice to support an inference of

discrimination." <u>Aka</u>, 156 F.3d at 1291.  The D.C. Circuit identified two such instances in <u>Aka</u>: when "the plaintiff calls the employer's explanation into question, but does so in a way that conclusively demonstrates that the real explanation for the employer's behavior is not discrimination, but some other motivation" and when "the plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue and there is abundant independent evidence in the record that no discrimination has occurred."  <u>Id.</u>

The second exception outlined in <u>Aka</u> applies to Chappelle's age and disability discrimination claims.  When he applied, Chappelle was 53 years old, Johnson was 59, and Hopkins was 60.  Pl.'s Stmt. of Genuine Issues ¶ 27; Chappelle Decl. ¶ 2.  So "even assuming pretext," the fact that two older employees were selected over Chappelle "cuts strongly against any inference of [age] discrimination."  <u>Murray v. Gilmore</u>, 406 F.3d 708, 715 (D.C. Cir. 2005).  The Court will therefore grant summary judgment to HHS on Chappelle's age discrimination claim in Count I.

Chappelle has also not shown that Goldhaber, the discriminatory actor he identifies, was aware of his disability.[7]  He asserts without proof that "Goldhaber and Lila Lee make me feel I am contagious."  Chappelle Affidavit at 7.  But Goldhaber states he was unaware of Chappelle's medical condition, and Chappelle offers no evidence to the contrary beyond his bare assertions.  Goldhaber Affidavit at 3.  The Court will therefore grant summary judgment to the Agency on his disability discrimination claim, too.

As for his race and sex discrimination claims, however, two women, one of whom is white, were selected over Chappelle, so his "prima facie case is stronger on th[ose] claim[s]."

---

[7] Weeden acknowledged that she was aware of Chappelle's medical condition, Weeden Affidavit at 3, but Chappelle does not assert that Weeden treated him differently because of his protected characteristics.  Chappelle's Answers to Interrogatories at 22.

Murray, 406 F.3d at 715.  While the diverse nature of the overall roster of selectees might cut against a finding of race or sex discrimination, the Court "see[s] no circumstances . . . that would preclude a rational factfinder from inferring discrimination from pretext."  Id.  The Court will therefore deny summary judgment on those claims.  See id. (disposing of race and sex discrimination claims differently under the Aka standard because employer replaced plaintiff with an employee of a different sex but the same race).

B.  Count II

Chappelle's next claim concerns his non-selection for the 2020 Portfolio Director position.  Because Chappelle has not shown that a reasonable jury could conclude he was "significantly better qualified for the job," nor offered other evidence from which a jury could infer discrimination, the Court will grant summary judgment to HHS on Count II.  Aka, 156 F.3d at 1294.

Sandra Webb, the selecting official, selected Marco Santos over Chappelle for the 2020 Portfolio Director position.  Santos "ranked first" in both his first and second round interviews.  Santos Selection Memorandum; Webb Affidavit at 12.  He had sixteen years of experience and leadership in the federal grant profession and was a GS-14 lead grants management specialist at HUD when he applied.  Santos Selection Memorandum.  Webb selected Santos because he expressed the best understanding of the expectations for the Portfolio Director and was able to articulate how his professional experience had prepared him for the role.  Webb Affidavit at 8.  Santos's references praised him as a "federal grant policy expert" with a "brilliant mind" and "kind, thoughtful, diplomatic approach," who "makes people around him better."  Id.

From this, Santos appears to be eminently qualified for the role.  Chappelle raises two major objections, however.  He emphasizes that Santos came from an agency outside ACF and

did not have the same level of executive experience as Chappelle, especially as Chappelle had served as the acting Portfolio Director.  Opp'n at 15–16.  Neither suffices to send Chappelle's claim to a jury.

First, although Chappelle is correct that Santos developed his grants management background at HUD and the EPA, rather than at ACF, that does not in itself render him less qualified than Chappelle.  The D.C. Circuit has expressly said that coming from an outside office is not "a sufficient means of showing that" a selectee is less qualified than the plaintiff.  Elliott v. Acosta, 291 F. Supp. 3d 50, 62 (D.D.C. 2018) (citing Stewart v. Ashcroft, 352 F.3d 422 (D.C. Cir. 2003).  Chappelle discounts Santos's experience in HUD and EPA, but "this Court cannot and will not tell [the Agency] what type of experience it should have valued in conducting its hiring process."  Id. at 63.  Indeed, the Court finds troubling the implication of Chappelle's argument:  that insiders should be favored over outside hires as a rule.

Chappelle attempts to bolster his position by complaining that because Santos "knew nothing about our programs, processes, or procedures, and had only limited knowledge about our e-grants system, GrantSolutions," Chappelle "had to train him after he was selected."  2021 Chappelle Affidavit at 7.  But some degree of training on internal systems is to be expected for any outside hire.  As Webb explained, Chappelle being "asked to answer Santos's questions" is the "standard expectation of a manager for any new ACF/OGM employee."  Webb Affidavit at 11.  Moreover, Webb noted that "[m]anaging federal grants requires a knowledge of the OMB Uniform Grant Guidance (2 CFR 200) which applies to all federal agencies."  Id. at 10.  The

Court has no reason to doubt that grant management skills are transferrable across federal agencies.[8]

Chappelle's second gripe is that unlike him, Santos never held a GS-15 position in an acting capacity, let alone the very position for which they both applied. Opp'n at 15–16. True, Webb confirmed that Santos had not served in an executive-level position prior to his selection. Webb Depo at 28:18-21. But Santos had leadership experience, too, as both he and Chappelle had "been supervisors with excellent results." Webb Affidavit at 10. Once again, it is not for the Court to "tell [the Agency] what type of experience" to value. Elliott, 291 F. Supp. 3d at 63. Nor will the Court draw the hard distinction between GS-15 level and all other supervisory experience that Chappelle advances.

And even though the Agency relied on Santos's interview performance to make the decision, "employers may of course take subjective considerations into account." Stoe, 960 F.3d at 644. Especially in the absence of evidence from which a jury could infer that Chappelle was "significantly better qualified" than Santos, Aka, 156 F.3d at 1294, the Court finds the reliance on Santos's interview performance unremarkable. For these reasons, the Court will grant summary judgment to HHS on Count II.[9]

---

[8] Chappelle argues that HUD had only recently implemented the federal grant management IT system, GrantSolutions, so Santos could only have used it briefly, but provides no citation for this assertion. Pl.'s Stmt. of Genuine Issues ¶ 47.

[9] The Court's analysis of Count I does not call this conclusion into question. The Agency maintains that none of the three selecting officials for the 2018 position participated in selections for the 2020 position. Goldhaber was Webb's direct supervisor, but she maintains that he did not play a role in the selection. Webb Affidavit at 11–12. And Chappelle has provided no evidence beyond conclusory assertions to show otherwise. See, e.g., 2021 Chappelle Affidavit at 7.

C.  Count III

Count III concerns Chappelle's underpayment during the first five months of his temporary detail in 2018.  Because Chappelle concedes that he did not timely initiate contact with an EEO counselor as to the matters alleged in this count, the Court will grant summary judgment to HHS.

Federal employees "must initiate contact with [an internal agency EEO] Counselor within 45 days of the matter alleged to be discriminatory [or retaliatory] or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).

Chappelle was aware that he was not being paid at the GS-15 level by August 2018, five months after his temporary promotion began in March.  See Emails Between Chappelle and Weeden.  Then, in September 2018, he signed an employee statement of understanding for his temporary promotion.  Def.'s Ex. 8 ("Temporary Statement of Understanding"), ECF No. 20-5. But he did not contact the EEO counselor until November 2, 2018, fifty-six days later.  See Notice of Right to File.

Chappelle concedes that "he did not timely initiate EEO Activity regarding the denial of pay during his detail from March 2018 until November 2018."  Opp'n at 2 n.1.[10]  The Court will accept his concession and grant summary judgment to the Agency.

But even if Chappelle had timely initiated EEO contact, the Court would grant summary judgment to HHS on the merits of his claim.  Chappelle has introduced no evidence from which a reasonable jury could infer that the period of nonpayment was discriminatory on any basis,

---

[10] The Court observes that Chappelle may have conceded this point too easily for the period from September 18, 2018 until October 27, 2018, as each day of underpayment arguably "constitutes a separate actionable 'unlawful employment practice,'" that "starts a new clock for filing charges alleging that act."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113–14 (2002).

rather than simply an honest mistake.  Weeden explained that the nonpayment "was an oversight not following up on submission of paperwork."  Weeden Affidavit at 11.  She acted promptly to ensure that Chappelle received the appropriate compensation once he alerted her to the mistake. See Emails Between Chappelle and Weeden; Emails Between Weeden and Ingram.  And Chappelle expressly disavows that Weeden treated him differently because of his protected characteristics.  See Chappelle's Answers to Interrogatories at 22.

Chappelle's only argument for why the nonpayment was discriminatory is that Goldhaber "has a clear animus against me and is not comfortable around me" so he "would never have engaged" Chappelle to correct the payment error.  2019 Chappelle Affidavit at 11.  But as just explained, it was Weeden, not Goldhaber, who selected Chappelle for the detail and handled the payment issues that arose.

The Court will therefore grant summary judgment to HHS on Count III.

IV.  **Conclusion**

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 20] Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: September 27, 2024